IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-1105

Filed 5 November 2024

Surry County, Nos. 21 JT 51-52

IN THE MATTER OF: J.M.V., JR. & S.M.Z.

Appeal by respondent-parents from orders entered 30 August 2023 by Judge Gretchen Hollar Kirkman in Surry County District Court. Heard in the Court of Appeals 11 October 2024.

*R. Blake Cheek for petitioner-appellee Surry County Department of Social Services.*

*James N. Freeman, Jr. for Guardian ad Litem.*

*Anné C. Wright for respondent-appellant father.*

*J. Thomas Diepenbrock for respondent-appellant mother.*

TYSON, Judge.

Respondent-mother appeals from the trial court's orders terminating her parental rights to her minor children J.M.V. ("James") and S.M.Z ("Stephen") on the grounds of neglect, willful failure to make reasonable progress, and dependency. Respondent-father, the biological father of James, appeals from the trial court's orders terminating his parental rights upon the same grounds. *See* N.C. R. App. P. 42(b) (pseudonyms used to protect the identity of minors).

## I. Background

The Surry County Department of Social Services ("DSS") filed juvenile

petitions on 16 April 2021, alleging then seven-year-old Stephen and three-year-old James were neglected and dependent juveniles due to improper care, supervision, discipline, and remedial care; and both were living in an injurious environment. DSS had become involved with the family on 31 March 2021 on alleged improper supervision when James was allegedly left unattended and fell down at least five stairs. Respondent-mother thought James may have a concussion, but she did not seek medical attention.

DSS met with the family on 15 April 2021 at The Shepherd's House, where the family was residing at the time, to conduct a child and family team meeting and to identify an alternative safety plan for the children. DSS learned the children had not eaten or drank fluids that day as of 11:30 a.m., and they had not been allowed to drink the night prior because they failed to consume all of their food for supper.

Respondent-father admitted he suffered from bi-polar disorder, depression, panic attacks, and ADHD, but he was not receiving treatment. Respondent-mother admitted she had been diagnosed with depression and anxiety, but she also was not receiving treatment. Respondent-mother also reported she had been recently having seizures, which had gotten worse with stress, and respondent-father would not allow her to get medical treatment because of their inability to pay the medical bills.

The petitions also alleged Stephen had been previously placed in foster care in Iredell County in 2016 and was adjudicated neglected, due to respondent-mother's untreated mental health issues, chronic homelessness, and her inability to meet

Stephen's basic needs. Following Stephen's return to respondents' care, the family resided in multiple states and in several shelters without staying involved with services put in place. Based upon these allegations, DSS obtained nonsecure custody of the children on 16 April 2021.

On 19 April 2021, respondents entered into case plans to address issues of mental health needs, parenting capacity/skills, lack of housing, and employment. Respondent-father's plan also addressed anger management.

Due to a conflict of interest with Surry County DSS, the case was transferred to Yadkin County on or about 5 May 2021. The Yadkin County District Court held a hearing on the petitions on 7 October 2021. On 3 November 2021, the court entered an order adjudicating the children as neglected and dependent juveniles. The court found both children had unaddressed speech delays and respondent-mother suffered from cognitive impairment.

Respondent-mother also had physical health issues causing her "hands [to] shake uncontrollably and she [was] very limited (sic) in the care she can provide the children. [Respondent-father] ha[d] to focus on providing care for the mother which thereby diminishe[d] his ability to provide adequate care to the children." Respondents were given one hour of supervised visitation every two weeks, contingent upon them appearing sober and not being incarcerated.

In a separate disposition order entered the same day, the court transferred the matter to Surry County, after having determined that the conflict of interest no

longer existed and continued custody of the children with Surry County DSS.

The Surry County District Court held a permanency planning hearing on 20 January 2022. The court set the permanent plan as reunification with respondents with a secondary plan of termination of parental rights and adoption. The court also ordered respondents to obtain mental health assessments and comply with the necessary and recommended treatment and to comply with the components of their case plans in an order entered 31 January 2022.

Following a 15 September 2022 review hearing, the trial court entered a permanency planning order on 17 October 2022 changing the primary permanent plan to termination of parental rights and adoption with a secondary plan of reunification. The court found since the last hearing, Stephen had alleged respondents' had sexually abused him while he was in their care. DSS investigated the allegations and internally substantiated sexual abuse by both respondents. Respondents were placed on the responsible individuals list ("RIL") and did not petition for judicial review. The court also found DSS noted some concerns regarding respondent-mother's decline in health. She requires assistance getting in and out of chairs, to maintain her balance, and to get down and up from the floor during visits. The court found respondents had not actively engaged in or cooperated with the plans, DSS, or the guardian *ad litem* ("GAL") and had acted inconsistently with the health or safety of their children. The court ordered no visitation for respondents due to Stephen's allegations and the internal DSS substantiation of the sexual abuse.

- 4 -

DSS filed a motion to terminate respondents' parental rights, on 2 March 2023, based upon the grounds of neglect, willful failure to make reasonable progress to correct the conditions which led to the children's removal from the home, and dependency. *See* N.C. Gen. Stat. §§ 7B-1111(a)(1), (2), and (6) (2023).

The trial court heard the motion on 18 April and 7 June 2023. In an order entered 30 August 2023, the trial court found all three grounds existed to terminate respondents' parental rights as alleged in the petitions. In a separate disposition order, the court concluded termination of respondents' parental rights was in the children's best interests and terminated respondent-mother's parental rights to James and Stephen, and respondent-father's parental rights to James. Respondents timely filed notices of appeal.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7B-1001(a)(7) (2023).

## III. Analysis

Respondent-father and respondent-mother challenge several of the trial court's findings of fact as lacking sufficient evidentiary support and challenge the trial court's adjudication concluding grounds existed to terminate respondents' parental rights to their children.

## A. Standard of Review

We review a trial court's adjudication concluding grounds exist to terminate

parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and [whether] the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re R.G.L.*, 379 N.C. 452, 456, 866 S.E.2d 401, 408 (2021) (quoting *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305 (2019)).

"Findings of fact not challenged by respondent are deemed [to be] supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citation omitted). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *Id.* at 407, 831 S.E.2d at 58–59. "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019) (citation omitted).

## B. Respondent-Father's Appeal

### 1. Challenged Findings

Respondent-father challenges findings of fact referencing Stephen's allegations of sexual abuse against respondents and DSS' purported substantiation of those allegations. Respondent-father challenges findings of fact 24, 71, 74, 75, 91, 94, 95, and 96, and asserts they are not supported by clear and convincing evidence.

He argues the testimony from the social worker and the social worker supervisor was inadmissible hearsay. Respondent-father argues the trial court erred in admitting the hearsay and cumulative testimonies over respondents' preserved objections.

### a. *Hearsay*

Although respondent-father initially objected to the social worker's testimony on hearsay grounds, he failed to lodge a continuing objection or renew his objections to the same testimony by the social worker later in her direct examination. Respondent-father also elicited similar testimony during his cross-examination of her. Respondent-father has lost the benefit of his prior objection. *State v. Davis*, 239 N.C. App. 522, 537, 768 S.E.2d 903, 912 (2015) ("When, as here, evidence is admitted over objection, but the same or similar evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost.") (citations, quotation marks, and brackets omitted).

During her direct examination, the social worker testified:

> Q. Now, likewise with [respondent-father], Ms. - - I'm sorry, [respondent-mother], [Stephen] made allegations of sexual abuse against [respondent-father]?
>
> A. He did.
>
> Q. And as you testified to, those allegations were substantiated?
>
> A. Correct.
>
> Q. And was [respondent-father] placed on the RIL – the responsible individuals list?

A. Yes, he was.

Q. As we sit here today, is he still on that list?

A. He is.

Q. Has [respondent-father] ever made any statements to the Department regarding his role or any type of culpability regarding those sexual abuse allegations?

A. He has.

Q. What are those statements?

A. He has stated that the Department has lied and made [Stephen] say those things.

Q. How many times has he made that statement to the Department?

A. I couldn't count on one hand. Many times. Multiple times.

Q. Has he ever made any admission to the Department that he accepts responsibility for these allegations that were made against him?

A. No, he has not.

Q. To the Department's knowledge, has [respondent-father] received any type of treatment or – mental health treatment regarding these sexual abuse allegations that were made against him?

A. I have no record of any treatment.

No objections were made to this testimony.

Respondent-father also failed to object to similar cumulative evidence by the social worker supervisor later in her testimony. Respondent-father testified during his direct examination regarding DSS' purported substantiation of the sexual abuse

allegations in September 2021, claiming Stephen's foster parents had made them up and had coached Stephen.

Respondent-father has waived his objections on hearsay grounds on appeal, "and the social worker's testimony must be considered to be competent evidence." *In re J.C.L.*, 374 N.C. 772, 775, 845 S.E.2d 44, 49 (2020). The testimony of the social worker and supervisor, as well as respondent-father's own testimony, support the trial court's findings of fact, and they are "deemed conclusive for appellate review purposes." *Id.*

Respondent-father did not challenge other findings of fact referencing the sexual abuse allegations, which are binding on appeal. *See In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58. The court found:

> 40. Respondent Father completed a psychological evaluation with Dr. Chris Shaeffer with TriCare, P.A. on March 10, 2022. . . . However, when asked about the sexual abuse allegations Respondent Father reported that the accusations were false.
>
> 41. Respondent Father continues to deny the accusations regarding the minor children's allegations that he sexually assaulted the juveniles.
>
> . . . .
>
> 43. On multiple occasions, the Respondent Father accused the Department of directing the juveniles to lie about the sexual abuse allegations towards Respondent Father and Respondent Mother.
>
> . . . .
>
> 46. Respondent Father has not discussed the sexual abuse

allegations with his counselor throughout the life of the underlying case.

Respondent-father's challenges to findings of fact 24,71, 74, 75, 91, 94, 95, and 96 regarding the sexual abuse allegations are waived and overruled.

### b. *Finding of Fact 33*

Respondent-father challenges the portion of finding of fact 33 stating that he had "planned to reduce services with Easter[s]eals if the children were returned to his custody and care." He argues his testimony "was that he believed the need for services would be somewhat reduced when the stress of family separation was no longer present" and intensive in-home services would be "a must" if the children were returned to their home.

During his cross examination, respondent-father testified:

> Q. And at this point, [respondent-father], do you plan to continue to receive services for the foreseeable future?
>
> A. Until everything dies down.
>
> Q. What is everything dies down, [ ]?
>
> A. Court, DHS, and getting our boys back, so.
>
> . . . .
>
> Q. . . . So my understanding from what you just said is that if – that you – your plan would be, once all the court stuff dies down, to basically stop utilizing the – community support services for Easterseals?
>
> A. As much. It still needs to be done right there, because for the – because I end up having in-home thing. They work with the family. Kids and the family, and they work

with them.  Because that's a must anyway to have that. During redirect, respondent-father testified he was going to try to use Easterseals less after the children returned home "because there will be less stress, and the only thing possibly do right there is, if needed, it will be the transportation be what's needed."

Respondent-father further explained he believed he would need less counseling, if the children were returned to his care, because the majority of the reason he needed counseling at the time was for his depression from having his children removed.  He stated that he would not "be refusing support.  It's just I won't be needing them as much."  While ambiguous and viewed in another light the family may need less care at home, the court's finding respondent-father had planned to reduce his services with Easterseals after the children were returned to his care is supported.  This finding, standing alone, would not support a conclusion to terminate their parental rights.

### c. *Finding of Facts 36 and 86*

Respondent-father challenges findings of fact 36 and 86 to the extent they find he failed to display any improvements in his parenting skills during visitations after completing the DSS plan's mandated parenting course.  He argues, although the social worker testified she did not observe improvements in respondent-father's parenting before and after parenting classes, no evidence tends to shows she had observed any visits prior to respondent-father completing his parenting class because

supervision was still with Yadkin County DSS at that time.

The social worker testified that she did not see a discernible difference in the visits after completion of the parenting classes, she did not see either respondent implement any skills from the parenting course on a consistent basis, and respondent-father showed "the same behavior before the completion of it to after the end of the visits that we had."

The social worker testified respondent-father had spent most of his attention during visits on respondent-mother and making sure her needs were met. While social worker testified he did engage in more play with the children, "[t]here were still multiple bathroom breaks during the [two-hour] visits." The social worker supervisor also cumulatively testified she had not observed respondents demonstrate additional skills or show any improvement in their parenting abilities after completing the DSS's mandated plan parenting classes. This testimony supports the trial court's findings. Respondent-father's challenge is overruled.

### d. *Finding of Fact 42*

Respondent-father next challenges finding of fact 42 in which the court found that he "shows no comprehension of the juveniles' needs as he continues to deny that either of the juveniles are developmentally delayed or in need of any services." Respondent-father asserts he acknowledged both children had speech delays, needed services, and had discussed the delays with the parenting educator. We agree.

Respondent-father testified that he knew James needed speech therapy and

had worked with him until they could get him into speech therapy and Stephen "had to start school to get him in speech[.]" The parenting teacher also testified both respondents had informed her of the developmental delays the children had, including speech. We agree with respondents this finding is not supported, does not meet any of DSS' burdens, and fails to support any conclusion. We disregard it. *In re N.G.*, 374 N.C. 891, 901, 845 S.E.2d 16, 24 (2020) (disregarding findings of fact not supported by clear, cogent, and convincing evidence).

### e. Finding of Fact 47

Respondent-father challenges the portion of finding of fact 47 stating that he "lacks insight into how his actions affect the minor children" as unsupported by the evidence. Respondent-father asserts he was both "involved and engaged" when participating in his parenting class, and the parenting educator's own assessments of him showed improvement in his parenting skills at the end of the program.

At the termination hearing, respondent-father continued to challenge the reasons the children were initially removed from the home, or the children were ever abused or neglected. He asserted DSS, the foster parents, and the staff at The Shephard's House made up the allegations, because it is the fastest way to terminate respondents' parental rights and to get the children adopted. Substantial evidence in the record supports the trial court's finding. Respondent-father's challenge is overruled.

### f. Findings of Fact 49 and 90

Respondent-father also challenges findings of fact 49 and 90 in which the court found that respondent-father continued to not take responsibility for his actions. Respondent-father asserts he did not deny that the circumstances that led to the children being removed from the home existed, but "[r]ather he denied that the children were left alone[,]" or that he had abused the children, or that the children were neglected in general.

He asserts his parental rights to challenge the accusations and "[t]hese denials do not equate to a failure to take responsibility for his actions when the alleged actions he denies were not properly found by the trial court to have happened."

Respondent-father continued to challenge the reasons the children were initially removed from their care and were neglected, despite the trial court having previously adjudicated the children as neglected. In the initial adjudication order, the court had found that the children were neglected based in part on them being "left unattended" while at "The Shepherd's House" where the family was residing at the time, and James had purportedly fallen down the stairs.

During the termination hearing, respondent-father challenged the adjudication finding he had left the children "alone unsupervised at the Shepherd's House." Respondent-father also testified the foster parents had coached Stephen into making the purported sexual abuse allegations to undermine their parental rights to facilitate adoption. He asserts DSS did not work with them to meet the statutory and

ordered goal of reunification, did not want anything to have to do with the truth because truth did not "fit their narrative."

The trial court found:

> 43. On multiple occasions, the Respondent Father accused [DSS] of directing the juveniles to lie about the sexual abuse allegations towards Respondent Father and Respondent Mother.
>
> 44. Respondent Father also accused staff at The Shepherd's House of making false reports that the children were unsupervised and not being appropriately fed.
>
> 45. Respondent Father accused staff at The Shepherd's House, DSS, the juveniles, and the juveniles' foster parents of lying in order to keep the children away from him and Respondent Mother.

Even if findings of fact 49 and 90 are unsupported and untrue, Respondent-father did not challenge findings of fact 43, 44 and 45, which are binding on appeal. These findings support the trial court's conclusions.

## 2. *Grounds for Termination*

Respondent-father challenges the trial court's conclusion that grounds existed to terminate his parental rights based upon neglect. "[A] fit parent is presumed to act in the child's best interest and that there is normally . . . no reason for the [S]tate to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Adams v. Tessener*, 354 N.C. 57, 60, 550 S.E.2d 499, 501 (2001) (citing *Troxel v. Granville*, 530 U.S. 57, 68-69, 147 L.Ed.2d 49, 58 (2000)).

Our Supreme Court has long and consistently held "natural parents have a constitutionally protected interest in the companionship, custody, care, and control of their children." *Price v. Howard*, 346 N.C. 68, 72, 484 S.E.2d 528, 530 (1997); *see also David N. v. Jason N.*, 359 N.C. 303, 305, 608 S.E.2d 751, 752-53 (2005).

"[S]o long as a parent adequately cares for his or her children ( *i.e.*, is fit), there will normally be *no reason for the State to inject itself* into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530 U.S. at 68-69, 147 L.Ed.2d at 58 (emphasis supplied).

"[A] natural parent may lose his constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with his or her constitutionally protected status." *David N.*, 359 N.C. at 307, 608 S.E.2d at 753. "[W]hile a fit and suitable parent is entitled to the [care,] custody [and control] of his child, it is equally true that where fitness and suitability are absent[,] he loses this right," subject to DSS supporting statutory reunification to preserve to family and aid the parents to reunite with their children. *Id.* at 305, 608 S.E.2d at 753 citation and quotation marks omitted); *see also Troxel,* 530 U.S. at 68-69, 147 L. Ed. 2d at 58; *Adams*, 354 N.C. at 61, 550 S.E.2d at 502.

By statutory definition, a juvenile may only be found to be "neglected" when their parent "[d]oes not provide proper care, supervision, or discipline" or "[c]reates

or allows to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15) (a), (e) (2023). A trial court may terminate parental rights under N.C. Gen. Stat. § 7B-1111(a)(1) only upon a finding that the parent has neglected their child such that the child meets the statutory definition of being a "neglected juvenile" and DSS has proven the presence of the likelihood of future neglect by the parent. N.C. Gen. Stat. § 7B-1111(a)(1) (2023).

"When a child has been out of the parent's custody for a significant period of time by the point at which the termination proceeding occurs, neglect may be established by a showing that the child was neglected on a previous occasion *and* the presence of the likelihood of future neglect by the parent if the child were to be returned to the parent's care." *In re J.D.O.*, 381 N.C. 799, 810, 874 S.E.2d 507, 517 (2022) (citation omitted) (emphasis supplied).

"When determining whether such future neglect is likely, the [trial] court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re R.L.D.*, 375 N.C. 838, 841, 851 S.E.2d 17, 20 (2020) (citation omitted). "Relevant to the determination of probability of repetition of neglect is whether the parent has made any meaningful progress in eliminating the conditions that led to the removal of the children." *In re O.W.D.A.*, 375 N.C. 645, 654, 849 S.E.2d 824, 831 (2020) (citation omitted).

Our Supreme Court has held:

> We hold that evidence of neglect by a parent prior to losing

custody of a child . . . is admissible in subsequent proceedings to terminate parental rights. The trial court *must also consider any evidence of changed conditions* in light of the evidence of prior neglect *and the probability of a repetition of neglect*. The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*.

*In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (internal citation omitted) (first two emphasis supplied).

Respondent-father does not challenge the trial court's determination the children were previously neglected, but he argues findings of fact are insufficient to support the trial court's determination that there was a likelihood of repetition of neglect if James were returned home. Respondent-father argues he had complied with his case plan and asserts his and respondent-mother's circumstances had significantly improved at the time of the termination hearing from the time when the children were removed from their care. *In re Ballard* mandates the trial court must "consider *any* evidence of changed conditions" and compliance with the case plan and completion of portions thereof is evidence of and creates a presumption of "changed conditions." *Id.* (emphasis supplied).

Although respondent-father did engage and participate in the services and completed portions of DSS' case plan, "a case plan is not just a checklist," and parents are "required to demonstrate acknowledgment and understanding of why the juvenile entered DSS custody as well as changed behaviors." *In re R.L.R.*, 381 N.C. 863, 875,

874 S.E.2d 579, 589 (2022) (citation and internal quotation marks omitted); *see also In re M.T.*, 285 N.C. App. 305, 332, 877 S.E.2d 732, 751 (2022) ("Parental compliance with a case plan alone is not always sufficient to preserve parental rights.").

The evidence and supported findings demonstrate respondent-father completed most aspects of his case plan. He denied the children were ever neglected, and blamed The Shepherd's House and DSS for the children being removed from their care. The court found respondent-father had completed the parenting class, and the social worker and supervisor had opined he did not display improved parenting capacity or demonstrate any skills learned during his visitations with the children.

Respondent-father continued to challenge the sexual abuse allegations, accused the foster parents of making up the allegations, to facilitate their adoption of his children and failed to discuss the allegations with his counselor throughout the life of the case.

The court also found respondent-father "is solely reliant upon Easter[s]eals for his day-to-day maintenance" and that "[i]t is expected" he "will continue to require peer support services from Easter[s]eals for the foreseeable future[;]" however respondent-father "planned to reduce his services with Easter[s]eals if the children were returned to his custody and care."

In arguing that the neglect ground should be reversed, respondent-father cites this Court's decision in *In re C.N.*, 266 N.C. App. 463, 831 S.E.2d 878 (2019). In that case, the children had been removed from the respondent-mother's care after the

youngest child had spilled Mr. Clean liquid detergent onto herself and the respondent-mother had promptly sought medical assistance. *Id.* at 469, 831 S.E.2d at 883. In reversing the ground of neglect, this Court determined that "[n]o evidence shows and the trial court made no findings indicating such actions were likely to be repeated." *Id.* The Court also reversed the ground under N.C. Gen. Stat. § 7B-1111(a)(2) for failing to make reasonable progress in correcting the conditions that led to the children's removal from the home. Although the respondent-mother had not addressed all of the concerns from her case plan, this Court noted the uncontested progress she had made and held that "[t]he evidence presented and the trial court's findings are insufficient to support the conclusion that 'neglect is ongoing, and there is a probability of repetition of neglect.'" *Id.*

This Court's decision in *In re C.N.* was later reviewed by and remanded to this Court from our Supreme Court to reconsider its holding in light of the Supreme Court's decisions in *In re B.O.A.*, 372 N.C. 372, 831 S.E.2d 305 (2019) and *In re D.W.P.*, 373 N.C. 327, 838 S.E.2d 396 (2020). *In re C.N.*, 373 N.C. 568 (2020).

In the case of *In re D.W.P.*, our Supreme Court affirmed the trial court's order terminating the respondent-mother's parental rights on the ground of neglect. *In re D.W.P.*, 373 N.C. at 340, 838 S.E.2d at 406. The respondent-mother's eleven-month-old son was treated for a broken femur and had numerous other fractures that were in the process of healing. *Id.* at 328, 838 S.E.2d at 399.

In affirming the trial court's conclusion that neglect was likely to reoccur if the

children were returned to the respondent-mother's care, our Supreme Court recognized the respondent-mother had made some progress on her case plan, but it noted the troublesome nature of the respondent-mother's "continued failure to acknowledge the likely cause of [her son's] injuries." *Id.* at 339, 838 S.E.2d at 406.

The Court further noted that despite the mother's recognition that her fiancé could have caused her son's injuries, she had re-established a relationship with him that resulted in domestic violence and had "refuse[d] to make a realistic attempt to understand how [her son] was injured or to acknowledge how her relationships affect her children's wellbeing." *Id.* at 340, 838 S.E.2d at 406

Upon remand in *In re C.N.*, this Court again reversed the trial court's termination of the mother's parental rights on the ground of neglect, determining that "[n]o evidence shows and the trial court made no finding indicating *either [the] Respondent-mother had denied responsibility* or a probability that her actions were likely to be repeated." *In re C.N.*, 271 N.C. App. 20, 26, 842 S.E.2d 627, 630 (2020) (emphasis supplied). In contrast to *In re D.W.P.*, this Court determined that "[n]othing indicates [the] Respondent-mother has continued to place her children at risk or failed to acknowledge her neglect was the cause of the initial injury to [the child] and the instance of lack of supervision of [another child]." *Id.*

Here, the trial court found respondent-father's continued actions and how they impacted the children, he continued to challenge the adjudication he had previously neglected the children, and, a likelihood existed the children would be neglected again

if returned to his home. The trial court's findings sufficiently support its conclusion grounds existed to terminate respondent-father's parental rights to James based upon neglect. *See In re L.G.G.*, 379 N.C. 258, 271, 864 S.E.2d 302, 310 (2021). The trial court did not err in terminating respondent-father's parental rights to James based on neglect.

Because only one ground is needed to support a trial court's order terminating parental rights, it is unnecessary to address respondent-father's arguments regarding the other two grounds of willful failure to make reasonable progress and dependency. *See In re C.K.I.*, 379 N.C. 207, 210, 864 S.E.2d 323, 326 (2021).

**C. Respondent-Mother's Appeal**

*1. Challenged Findings*

Similar to respondent-father, respondent-mother challenges several findings of fact referring to the purported sexual abuse allegations made by Stephen as unsupported because they rely upon inadmissible hearsay. Like respondent-father, respondent-mother initially objected to the challenged testimony, but later failed to make a standing objection or renew her objections to similar evidence during the testimony of the social worker and the cumulative evidence of her supervisor, and she also elicited some of the same evidence during her cross examination of the social worker.

As with respondent-father, respondent-mother lost the benefit of her prior preserved objections and waived any challenge to the admission of the hearsay.

*Davis*, 239 N.C. App. at 537, 768 S.E.2d at 912. We overrule respondent-mother's challenges to findings 24, 71, 74, 91, 94, and 96.

Respondent-mother also challenges findings of fact 90, 101, 105, 106, 108, 111, and 113 to the extent they state that she had failed to comply with her case plan or to make reasonable progress. She contends she fully engaged in her case plan with DSS, noting that she has consistently engaged in therapy since March 2022, successfully completed a psychological evaluation in March 2022, has obtained and maintained independent housing, and has attended to her medical needs and has improved her physical health.

The findings show respondent-mother made progress on her case plan, but the conditions that led to the children's removal from her care continued to exist. Respondent-mother completed the parenting class; however, DSS staff opined she demonstrated no changed parenting behaviors during her every two-week visitations with the children. She purportedly sat on a bench during the visits and did "not engage with the juveniles."

Respondent-mother continued to suffer issues with economic and domestic instability, had not obtained employment or disability benefits, and was reliant upon Easterseals to maintain her day-to-day needs. While respondent-mother "made significant improvements in her physical health," she continued to suffer from ongoing medical issues of anxiety, depression, and partial complex seizures, which were exacerbated by stress and anxiety. Respondent-mother also continued to deny

the children were neglected and she agreed with respondent-father regarding the purported false, contrived and unproven sexual abuse allegations. The trial court found respondent-mother has failed to make reasonable progress in correcting the conditions which led to the children's removal.

## 2. *Grounds for Termination*

Respondent-mother argues the trial court's proper findings of fact do not support its conclusion there is a likelihood of repetition of future neglect. She contends she substantially completed and complied with the components of her DSS case plan, and, the court's conclusion is not supported.

Although respondent-mother made progress on her case plan, she failed to demonstrate an "acknowledgment and understanding of why the juvenile[s] entered DSS custody as well as changed behaviors." *In re R.L.R.*, 381 N.C. at 875, 874 S.E.2d at 589.

The findings show respondent-mother had failed to demonstrate understanding of her role in the children being removed from her and respondent-father's care, continued to deny the children were neglected, lacked the capacity to protect the children from respondent-father, and had failed to demonstrate significant improvement in her parenting capability.

While respondent-mother clearly made some improvement in her physical health, the court found her psychological evaluation indicated she displayed "clear impairment in her short-term memory and attention" and that "[h]er cognitive

challenges are significant and are sufficient to create substantial challenges to parenting."

Respondent-mother also had not secured economic or domestic stability. This finding alone cannot support termination of her parental rights. N. C. Gen. Stat. § 7B-1111(a)(2) includes the "poverty exception," which provides "No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty." N.C. Gen. Stat. § 7B-1111(a)(2) (2023).

Our Supreme Court has recently held: "The poverty exception in N.C.G.S. § 7B-1111(a)(2) does not define the 'elements' of this statutory ground for terminating parental rights. The exception instead establishes what is *not* a willful failure to make reasonable progress under the circumstances for purposes of N.C.G.S. § 7B-1111(a)(2)." *In re T.M.L.*, 377 N.C. 369, 382, 856 S.E.2d 785, 794 (2021). We disregard this finding as unsupported and irrelevant. *In re N.G.*, 374 N.C. at 901, 845 S.E.2d at 24 (disregarding findings of fact not supported by clear, cogent, and convincing evidence).

The trial court did not err in concluding grounds existed to terminate respondent-mother's parental rights based upon failure to make reasonable progress.

Because we conclude the trial court properly found grounds existed based upon failure to make reasonable progress, we do not address respondent-mother's challenges to the trial court's other grounds. *See In re C.K.I.*, 379 N.C. at 210, 864 S.E.2d at 326.

## IV.    Conclusion

The trial court did not err in determining grounds existed to terminate respondent-father's parental rights on the ground of neglect and respondent-mother's parental rights on the ground of failure to make reasonable progress.  Respondents do not challenge the trial court's determination that termination of their parental rights was in the children's best interests.  The trial court's orders are affirmed.

AFFIRMED.

Judges WOOD and GORE concur.